JOHN C. CRUDEN
Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division
KATHERINE A. LOYD
1961 Stout St., 8th floor
Denver, CO 80294
(303) 844-1365
(303) 844-1350 (fax)
kate.loyd@usdoj.gov
Attorneys for United States of America

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

_____
                               )
                               )

UNITED STATES OF AMERICA,       )
                               )

        Plaintiff,        )
                               )

        v.        )        Civil No.
                               )

BP EXPLORATION (ALASKA) INC.,   )
                               )

                               )        __COMPLAINT__
        Defendant.        )
_____ )

The United States of America, by authority of the Attorney General of the United States

and through the undersigned attorneys, acting at the request of the Administrator of the United

States Environmental Protection Agency (EPA) and the Secretary of the United States

Department of Transportation, files this Complaint and alleges as follows:

## NATURE OF ACTION

1. This is a civil action against BP Exploration (Alaska) Inc. (BPXA) seeking injunctive

relief and an assessment of civil penalties for violations of the Clean Water Act, 33 U.S.C.

§§ 1311, 1319, 1321, as amended by the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq.; the

Clean Air Act (CAA), 42 U.S.C. §§ 7401-7671q; and the Federal Pipeline Safety Laws, 49

U.S.C. § 60101 et seq.  The Clean Water Act claims against BPXA arise from two unauthorized

discharges of crude oil into navigable waters of the United States from BPXA's pipelines on the

North Slope of Alaska in the spring and summer of 2006, as well as violations of the Spill

Prevention Control and Countermeasure (SPCC) regulations promulgated pursuant to the Clean

Water Act.  The Clean Air Act claims against BPXA arise from the improper removal of

asbestos-containing materials from its pipelines in the spring and summer of 2006, in violation of

the National Emission Standards for Hazardous Air Pollutants (NESHAP) for asbestos,

promulgated by EPA under 42 U.S.C. § 7412, and codified at 40 C.F.R. §§ 61.140-61.157.  The

Pipeline Safety Law claims arise from BPXA's failure to comply with an order issued by the

Pipeline and Hazardous Materials Safety Administration of the United States Department of

Transportation (DOT-PHMSA) pursuant to 49 U.S.C. § 60112, requiring BPXA to perform

corrective action on its pipelines.

## PARTIES

2.  Defendant BPXA is a Delaware corporation with its principal place of business in

Anchorage, Alaska.  At all times relevant to this action, Defendant was the operator of the

Greater Prudhoe Bay Unit, Milne Point Unit, and Badami Unit on the North Slope of Alaska.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over this matter pursuant to 33 U.S.C. §§ 1319(b) and

1321(b)(7)(E), and (n), 42 U.S.C. § 7413(b), 49 U.S.C. § 60120(a)(1), and 28 U.S.C. §§ 1331,

1345, and 1355.

COMPLAINT - Page 2

4.  Notice of commencement of this action has been given to the Director of the Alaska Department of Environmental Conservation as required by 42 U.S.C. § 7413(b).

5.  Venue is proper in this district pursuant to 33 U.S.C. § 1321(b)(7)(E), 42 U.S.C. § 7413(b), and 28 U.S.C. §§ 1391 and 1395 because the violations that are the subject of this action occurred in this district, and Defendant is located in, does business in, and is found in this District.

## STATUTORY BACKGROUND
### (CLEAN WATER ACT)

6. The Clean Water Act prohibits the discharge of any pollutant, including oil, by any person, except as authorized by and in compliance with other sections of the Act.  33 U.S.C. § 1311(a).  A "discharge of a pollutant" includes "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  "Navigable waters" are defined as "the waters of the United States, including the territorial seas."  33 U.S.C. § 1362(7).

7.  The Clean Water Act authorizes the Administrator of the EPA to, *inter alia*, issue compliance orders for discharges of pollutants prohibited under 33 U.S.C. § 1311(a).   33 U.S.C. § 1319(a).   This Act also authorizes the Administrator of the EPA to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which the Administrator is authorized to issue a compliance order under 33 U.S.C. § 1319(a).  33 U.S.C. § 1319(b).

8.  The Clean Water Act prohibits the discharge of oil into or upon the navigable waters of the United States and adjoining shorelines in such quantities as the President determines may be harmful to the public health or welfare or the environment of the United States.  33 U.S.C. §

COMPLAINT - Page 3

1321(b)(3).  This Act defines "discharge" to include "any spilling, leaking, pumping, pouring, emitting, emptying or dumping . . . ."  33 U.S.C. § 1321(a)(2).

9.  Pursuant to 33 U.S.C. § 1321(b)(4), EPA has determined by regulation that the quantities of oil that may be harmful to the public health or welfare or the environment of the United States include discharges of oil that violate applicable water quality standards, or cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines, or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines.  *See* 40 C.F.R. § 110.3.

10.  The Clean Water Act provides that:

(A) Discharge, generally
     Any person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of [Section 311(b)(3) of the CWA], shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged.

\*\*\*

(C) Failure to comply with regulation
     Any person who fails or refuses to comply with any regulation issued under subsection (j) of this section shall be subject to a civil penalty in an amount up to $25,000 per day of violation.

(D) Gross negligence
     In any case in which a violation of paragraph (3) was the result of gross negligence or willful misconduct of a person described in subparagraph (A), the person shall be subject to a civil penalty of not less than $100,000, and not more than $3,000 per barrel of oil or unit of reportable quantity of hazardous substance discharged.

33 U.S.C. § 1321(b)(7).  The penalty amounts provided for by the Clean Water Act have been adjusted upwards for inflation by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461) and Debt Collection Improvement Act of 1996 (31 U.S.C. § 3701), and 40 C.F.R. § 19.4.

11.  The Clean Water Act authorizes EPA to promulgate regulations establishing methods and procedures for removal of discharged oil, establishing the criteria for the development of oil and hazardous substance removal contingency plans, and establishing procedures, methods and equipment to prevent discharges of oil from onshore facilities.  33 U.S.C. § 1311(j).  EPA has promulgated such regulations setting forth what are known as Spill Prevention Control and Countermeasure requirements, which are codified at 40 C.F.R. Part 112 (SPCC Regulations).

12.  The SPCC Regulations apply to owners and operators of non-transportation-related onshore and offshore facilities engaged in drilling, producing, gathering, storing, processing, refining, transferring, distributing or consuming oil and oil products, which, due to their location, could reasonably be expected to discharge oil in harmful quantities into or upon the navigable waters of the United States or adjoining shorelines.  40 C.F.R. Part 112.

13.  Owners and operators of onshore and offshore facilities in operation before January 10, 1974, the effective date of the Oil Pollution Prevention Regulations, had to prepare written SPCC Plans, in accordance with 40 C.F.R. § 112.7, within six months of the effective date of the regulations, *i.e.*, by July 10, 1974, and implement those Plans within one year of the effective date of the regulations, *i.e.*, by January 10, 1975.  40 C.F.R. § 112.3.

14.  Owners or operators of facilities that are required to prepare an SPCC Plan are required to complete a review and evaluation of the SPCC Plan and its implementation at least once every five years from the date the facility becomes subject to 40 C.F.R. Part 112.  See 40 C.F.R. § 112.5(b).

### (FEDERAL PIPELINE SAFETY LAWS)

15.  Hazardous liquid pipelines were regulated for safety under The Pipeline Safety Act of 1979, former 49 U.S.C. app. § 1671 et seq.  In 1994, Public Law 103-272 repealed this act and

codified its provisions without substantive change at 49 U.S.C. § 60101 et seq. The Federal

Pipeline Safety Laws, codified at 49 U.S.C. § 60101 et seq., were amended by the Accountable

Pipeline Safety and Partnership Act of 1996. The Pipeline Safety Laws were further amended by

the Pipeline Safety Improvement Act of 2002 and the Pipeline Inspection, Protection,

Enforcement and Safety Act of 2006.

16. The purpose of the Federal Pipeline Safety Laws "is to provide adequate protection

against risks to life and property posed by pipeline transportation and pipeline facilities by

improving the regulatory and enforcement authority of the Secretary of Transportation." 49

U.S.C. § 60102 (a) (1).

17. Pursuant to 49 U.S.C. § 60102 (a) (2):

The Secretary shall prescribe minimum safety standards for pipeline facilities.
The standards apply to owners and operators of pipeline facilities; may apply to
the design, installation, inspection, emergency plans and procedures, testing,
construction, extension, operation, replacement, and maintenance of pipeline
facilities; and shall include a requirement that all individuals who operate and
maintain pipeline facilities shall be qualified to operate and maintain the pipeline
facilities.

18. The Pipeline Safety Laws authorize the Secretary of Transportation to, *inter alia*,

issue corrective action orders if a pipeline facility is or would be hazardous. 49 U.S.C. § 60112.

19. Pursuant to 49 U.S.C. § 60112:

(a) General Authority.— After notice and an opportunity for a hearing, the
Secretary of Transportation may decide that a pipeline facility is hazardous if the
Secretary decides that—
(1) operation of the facility is or would be hazardous to life, property, or the
environment . . .

***

(d) Corrective Action Orders.—

COMPLAINT - Page 6

(1) In general.— If the Secretary decides under subsection (a) of this section that a pipeline facility is or would be hazardous, the Secretary shall order the operator of the facility to take necessary corrective action, including suspended or restricted use of the facility, physical inspection, testing, repair, replacement, or other appropriate action.

20.  Pursuant to these statutory authorities, DOT-PHMSA promulgated Pipeline Safety Regulations.  Those regulations are set forth at Title 49, Parts 190-195 and Part 199.  Part 195 provides minimum federal safety standards for the transportation of hazardous liquid and carbon dioxide by pipeline.

21.  Pursuant to 49 U.S.C. § 60101(a)(5), "hazardous liquid pipeline facility" includes a pipeline, right of way, a facility, a building or equipment used or intended to be used in transporting hazardous liquid.

22.  Pursuant to 49 U.S.C. § 60120, the Secretary of Transportation may bring a civil action in an appropriate district court of the United States to enforce this chapter, including section 60112, or a regulation prescribed or order issued under this chapter.  The court may award appropriate relief, including a temporary or permanent injunction, punitive damages, and assessment of civil penalties, considering the same factors as prescribed for the Secretary in an administrative case under section 60122.

23.  Authority to bring this action is vested in the United States Department of Justice under 49 U.S.C. § 60120(a)(1), and 28 U.S.C. §§ 516 and 519.

**(CLEAN AIR ACT)**

24.  The Clean Air Act authorizes EPA to identify air pollutants determined to be hazardous and to prescribe emissions standards for those pollutants.  These standards are known as the National Emission Standards for Hazardous Air Pollutants (NESHAP).  42 U.S.C. § 7412.

COMPLAINT - Page 7

25.  EPA has listed asbestos as a hazardous air pollutant under the authority of 42 U.S.C. § 7412(b), and has also adopted an asbestos NESHAP which includes regulations governing the emission, handling, and disposal of asbestos during renovation of asbestos-containing facilities. These regulations are codified at 40 C.F.R. §§ 61.140-61.157.

26.  The Clean Air Act prohibits the operation of any stationary source in violation of an applicable NESHAP standard.  42 U.S.C. § 7412(i)(3)

27.  The Clean Air Act authorizes the United States to commence actions for injunctive relief and/or civil penalties for violation of, among other provisions, violations of the asbestos NESHAP.  42 U.S.C. § 7413(b).  That authority is retained despite any delegations to states. See 42 U.S.C. § 7412(l)(7).

## FACTUAL ALLEGATIONS

28.   BPXA is a "person" within the meaning of 33 U.S.C. § 1362(5) and 42 U.S.C. § 7602(e).  BPXA is also an owner or operator of a stationary source and a renovation activity within the meaning of 42 U.S.C. § 7412(a)(3) and (9), and 40 C.F.R. §§ 61.02 and 61.141.

29.  This action is preceded by a criminal case against BPXA.  The Plea Agreement, reached in that case, Crim. No. 3:07-cr-00125-TMB (D. Alaska), and entered on November 29, 2007, states: "BPXA agrees to plead guilty to a one-count information charging BPXA with a violation of the Clean Water Act, 33 U.S.C. §§ 1319(c)(1), 1321(b)(3), for the negligent discharge of a harmful quantity of oil to a water of the United States."

30.  Beginning on or about March 1 and lasting through March 6, 2006, a discharge of oil occurred from the oil transit lines near gathering center 2 (GC-2 ) in the Greater Prudhoe Bay Unit.  An estimated 212,252 gallons of oil spread over approximately two acres of tundra wetlands and a frozen lake, known as Q-Pad Lake, before BPXA noticed and stopped the leak.

31.  On August 6, 2006, a discharge of oil totaling approximately 1,000 gallons occurred from the oil transit line between flow stations 1 and 2 in the Greater Prudhoe Bay Unit.  The oil flowed to wetlands and adjacent shorelines.

32.  The Plea Agreement contains factual information regarding the spills alleged in this Complaint and is attached as Exhibit A.  The elements of the misdemeanor charge relating to the March 2006 leak to which BPXA pled guilty are as follows: "(1) the defendant discharged oil from a point source; (2) the amount of oil discharged was a quantity deemed to be harmful by federal regulation; (3) the oil was discharged in waters of the United States; and (4) the discharge was caused by the negligence of the defendant."  Id.

33.  The March 2006 leak caused sheens to appear on Q-Pad lake and wetlands adjacent to the Beaufort Sea and the Kuparuk River, and the August 2006 leak caused sheens to appear in the wetlands adjacent to the Beaufort Sea and the Sagavanirktok River.  Both the March 2006 leak and the August 2006 leak discolored the surface of those waters, wetlands, and the adjoining shorelines.

34.  Q-Pad Lake, the Sagavanirktok River, the Kuparuk River, the Beaufort Sea, the unnamed tributaries of those bodies of water, and the wetlands adjacent to those bodies of water, into and onto which BPXA discharged oil, constitute "navigable waters of the United States" within the meaning of Sections 311(b)(3) and 502(7) of the CWA.

35.  Crude oil is "oil" within the meaning of Section 311(b)(3) of the CWA.

36.  The oil transit lines located in the Greater Prudhoe Bay Unit are at least one "onshore facility" within the meaning of Section 311(b)(7) of the CWA.

37.  The oil transit lines located in the Greater Prudhoe Bay Unit are at least one "point source" within the meaning of Section 502(14) of the CWA.

38.  BPXA is engaged in producing, gathering, storing, processing, refining, transferring, distributing or consuming oil or oil products at the Greater Prudhoe Bay Unit, Milne Point Unit, and Badami Unit Facilities, as defined in 33 U.S.C. § 1321(a)(1), and 40 C.F.R. §§ 112.1 and 112.2.

39.  At all relevant times, BPXA owned and operated the Greater Prudhoe Bay Unit, Milne Point Unit, and Badami Unit facilities.  The Greater Prudhoe Bay Unit, Milne Point Unit, and Badami Unit Facilities are each an "onshore facility" within the meaning of 33 U.S.C. § 1321(a)(10), and 40 C.F.R. § 112.2.

40.  The Greater Prudhoe Bay Unit has the capacity to store approximately 18,789,158 gallons of petroleum products in aboveground storage tanks.  The Milne Point Unit has the capacity to store approximately 2,682,924 gallons of petroleum products in aboveground storage tanks.  The Badami Unit has the capacity to store approximately 764,148 gallons of petroleum products in aboveground storage tanks.

41.  The storm water from the Greater Prudhoe Bay Unit, Milne Point Unit, and Badami Unit Facilities drains into the Putuligayuk River, the Kuparuk River, the Sagavanirktok River, the unnamed tributaries of those bodies of water, the wetlands adjacent to those bodies of water, and the Beaufort Sea.  The Putuligayuk River, the Kuparuk River, the Sagavanirktok River, the Beaufort Sea, and the wetlands adjacent to those bodies of water are "navigable waters" within the meaning of 33 U.S.C. § 1362(7).

42.  Due to their locations, in the event of a discharge of oil, the Greater Prudhoe Bay Unit, Milne Point Unit, and Badami Unit facilities could reasonably be expected to discharge oil in harmful quantities, as defined by 40 C.F.R. Part 110, into or on a navigable water of the United States or its adjoining shorelines.

COMPLAINT - Page 10

43. According to BPXA's SPCC plan, the Greater Prudhoe Bay Unit, Milne Point Unit, and Badami Unit facilities are located "*at a distance…such that a discharge from the facility could cause injury to fish and wildlife and sensitive environments*."  The facilities are subject to facility response plan regulations, codified at 40 C.F.R. §§ 112.20 and 112.21, including Appendices B through F.

44. In an inspection conducted on or about September 24, 2007 through September 28, 2007, EPA ascertained that BPXA had failed to prepare and implement an SPCC Plan in accordance with good engineering practices and had failed to implement certain required spill prevention measures, in violation of 40 C.F.R. §§ 112.3 and 112.7.

45. BPXA transports hazardous liquid through pipelines it operates in the state of Alaska.

46. BPXA is subject to the Federal Pipeline Safety Laws, 49 U.S.C. § 60101 et seq. Portions of its operations are also subject to the regulations for the transportation of hazardous liquids and carbon dioxide by pipeline in 49 C.F.R. Part 195.

47. BPXA is a "person" as defined in 49 U.S.C. § 60101 and 49 C.F.R. § 195.2.

48. On March 15, 2006, the Associate Administrator for Pipeline Safety of DOT-PHMSA issued a Corrective Action Order, CPF No. 5-2006-5015H (Order),  pursuant to 49 U.S.C. §60112, to BPXA.

49. The Order required BPXA to take corrective action to protect the public, property and the environment from hazards associated with a failure discovered March 3, 2006, involving the pipelines operated by BPXA in Greater Prudhoe Bay, Alaska.

50. DOT-PHMSA amended the Order on July 20, 2006, August 10, 2006, and April 27, 2007.  Upon BPXA's request, DOT-PHMSA extended some deadlines under the Order.

51.  BPXA is currently subject to the Order's requirements.

52.  Beginning in early March 2006 and continuing until August 21, 2006, Defendant BPXA removed external insulation from oil transit lines in the Greater Prudhoe Bay Unit, in preparation for pipeline inspection activities.

53.  Beginning in March and lasting through at least August of 2006, BPXA unlawfully removed regulated asbestos-containing material, as detailed below, from the oil transit lines located in the Greater Prudhoe Bay Unit.

54.  The Greater Prudhoe Bay Unit is a "facility" within the meaning of 40 C.F.R. § 61.141.

55.  The oil transit lines located in the Greater Prudhoe Bay Unit are "facility components" within the meaning of 40 C.F.R. § 61.141.

56.  The combined amount of regulated asbestos-containing material that was stripped, removed, dislodged, cut, drilled, or similarly disturbed during the Greater Prudhoe Bay Unit renovation operation between early March 2006 and August 21, 2006, was in excess of 15 square meters (160 square feet) on facility components or in excess of 80 linear meters (260 linear feet) on pipes and was therefore subject to the asbestos NESHAP work practice requirements.

57.  The facility which was the subject of renovation contained quantities of regulated asbestos-containing materials in excess of 15 square meters (160 square feet) on facility components or in excess of 80 linear meters (260 linear feet) on pipes and was therefore subject to the asbestos NESHAP work practice requirements.

58. BPXA is subject to the NESHAP regulations because it "owned" or "operated" a renovation operation at which the threshold amount of regulated asbestos-containing material was stripped, removed, dislodged, cut, drilled, or similarly disturbed during the renovation.

59. BPXA failed to conduct a survey of the facility or part of the facility where the renovation operation occurred for the presence of asbestos before beginning the renovation as required by 40 C.F.R. § 61.145(a).

60. BPXA failed to provide written notification at least 10 working days prior to beginning asbestos stripping or removal work in March 2006 as required by 40 C.F.R. § 61.145(b).

61. BPXA failed to adequately wet regulated asbestos-containing material that was being stripped from facility components as required by 40 C.F.R. § 61.145(c)(3).

62. BPXA failed to adequately wet regulated asbestos-containing material that had been stripped from facility components and ensure that it remained wet until collected and contained or treated in preparation for disposal as required by 40 C.F.R. § 61.145(c)(6)(i).

63. BPXA failed to have an on-site representative who was trained in proper removal of regulated asbestos-containing material present while regulated asbestos-containing material was being stripped, removed or otherwise handled or disturbed, as required by 40 C.F.R. § 61.145(c)(8).

64. BPXA failed to mark vehicles used to transport asbestos-containing waste material during the loading and unloading of waste as required by 40 C.F.R. §§ 61.149(d)(1) and 61.150(c).

65. BPXA failed to dispose of all asbestos-containing waste material at a waste disposal site operated in accordance with 40 C.F.R. § 61.154, as required by 40 C.F.R. § 61.150(b)(1).

COMPLAINT - Page 13

66. BPXA failed to maintain waste shipment records for all asbestos-containing waste material transported off the facility site as required by 40 C.F.R. § 61.150(d).

67. BPXA discharged visible emissions to the outside air during the collection, processing, packaging, or transporting of any asbestos-containing waste material in violation of 40 C.F.R. § 61.150(a), and it did not use one of the emission control and waste treatment methods specified in 40 C.F.R. § 61.150(a)(1) through (4).

## CLAIMS

### First Claim for Relief
(Civil Penalties under Section 311(b) of the Clean Water Act for the March 2006 Leak)

68. The allegations of the foregoing paragraphs are incorporated herein by reference.

69. Beginning on or about March 1 and lasting through about March 6, 2006, a discharge of oil occurred from the oil transit line near GC-2 in the Greater Prudhoe Bay Unit into the navigable waters and/or adjoining shorelines in violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

70. BPXA, as an owner and/or operator of the oil transit lines and the Greater Prudhoe Bay Unit at the time of the discharge near GC-2, is liable for a civil penalty of up to $1,100 per barrel discharged, pursuant to Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), and 40 C.F.R. § 19.4.  To the extent that the discharges of oil resulted from gross negligence or willful misconduct, Defendant is liable for a civil penalty of not less than $130,000 per discharge and not more than $4,300 per barrel of oil discharged.  33 U.S.C. § 1321(b)(7)(D).

### Second Claim for Relief
(Civil Penalties under Section 311(b) of the Clean Water Act for the August 2006 Spill)

71. The allegations of the foregoing paragraphs are incorporated herein by reference.

COMPLAINT - Page 14

72. On or about August 6, 2006, a discharge of oil occurred from the oil transit lines into the navigable waters and/or adjoining shorelines between flow stations 1 and 2 in the Greater Prudhoe Bay Unit in violation of Section 311(b)(3) of the CWA, 33 U.S.C. § 1321(b)(3).

73. BPXA, as an owner and operator of the oil transit lines and the Greater Prudhoe Bay Unit at the time of the discharge between flow stations 1 and 2 in the Greater Prudhoe Bay Unit, is liable for a civil penalty of up to $1,100 per barrel discharged, pursuant to Section 311(b)(7)(A) of the CWA, 33 U.S.C. § 1321(b)(7)(A), and 40 C.F.R. § 19.4.  To the extent that the discharges of oil resulted from gross negligence or willful misconduct, Defendant is liable for a civil penalty of not less than $130,000 per discharge and not more than $4,300 per barrel of oil discharged.  33 U.S.C. § 1321(b)(7)(D).

**Third Claim for Relief**
(Injunctive Relief under Section 301(a) of the Clean Water Act for the March and August Spills)

74. The allegations of the foregoing paragraphs are incorporated herein by reference.

75. The discharges of oil, alleged in the previous two claims for relief, violated Section 301(a) of the CWA, 33 U.S.C. § 1311(a).  Therefore, Defendant is subject to injunctive relief pursuant to Section 309(b) of the Clean Water Act, 33 U.S.C. § 1319(b), to take all appropriate action to prevent further discharges from its oil transit lines into waters of the United States. Unless enjoined, Defendant may continue to violate the Clean Water Act.

**Fourth Claim for Relief**
(Failure to Prepare and Implement an Adequate SPCC Plan at the Greater Prudhoe Bay Unit)

76. The allegations of the foregoing paragraphs are incorporated herein by reference.

77. At the Greater Prudhoe Bay Unit, BPXA failed to comply with the requirements of the CWA and the SPCC Regulations promulgated thereunder, by failing to prepare and implement an SPCC Plan in accordance with good engineering practices, and failing to

implement certain required spill prevention measures, in violation of 40 C.F.R. §§ 112.3 and 112.7. Specifically, BPXA:

a. failed, in its SPCC Plan, to identify the location of bulk storage containers observed at the facility, including some stationary tanks, oil-filled operational equipment, oil separation and treating vessels and equipment, and long-term storage locations for mobile containers and drums, as required by 40 C.F.R. § 112.7(a)(3);

b. failed, in its SPCC Plan, to indicate the type of oil and the storage capacity for all oil storage containers of 55 gallons and above, as required by 40 C.F.R. 112.7(a)(3)(i);

c. failed, in its SPCC Plan, to address appropriate containment and/or diversionary structures or equipment to prevent a discharge, specifically at the oil truck loading/unloading areas, as required by 40 C.F.R. § 112.7(c);

d. failed to construct all bulk storage tank installations with adequate secondary containment, specifically at the BOC Bulk Fuel Plant and Bulk Chemical site, as required by 40 C.F.R. § 112.8(c)(2);

e. failed to construct all container installations in accordance with good engineering practices to avoid discharges, specifically at the BOC Bulk Fuel Plant and Bulk Chemical site, as required by 40 C.F.R. § 112.8(c)(8);

f. failed to properly design pipe supports to minimize abrasion and corrosion at all locations, specifically at the BOC Bulk Fuels site, as required by 40 C.F.R. § 112.8(d)(3);

g. failed to properly close and seal drains or dikes at tank batteries and separation and treating areas where there is a reasonable possibility of discharge, specifically at GC-3, as required by § 112.9(b)(1); and

h. failed, in its SPCC plan, to address appropriate containment for any of the oil separation and treating vessels and equipment with capacities greater than 55-gallons at Greater Prudhoe Bay, as required by § 112.9(c)(2).

78.  By its failure to prepare and implement an SPCC Plan at the Greater Prudhoe Bay Unit facility in accordance with good engineering practices, and its failure to implement certain required spill prevention measures, BPXA violated the regulations at 40 C.F.R. Part 112, issued under CWA Section 311(j), 33 U.S.C. § 1321(j), which sets forth the requirements for preparation and implementation of SPCC Plans.

79.  Accordingly, pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), as adjusted by 40 C.F.R. § 19.4, BPXA is liable for injunctive relief and a civil penalty of not to exceed $32,500 per day per violation.

## Fifth Claim for Relief
(Failure to Prepare and Implement an Adequate SPCC Plan at the Milne Point Unit Facility)

80.  The allegations of the foregoing paragraphs are incorporated herein by reference.

81.  At the Milne Point Unit, BPXA failed to comply with the requirements of the CWA and the SPCC Regulations promulgated thereunder, by failing to prepare and implement an SPCC Plan in accordance with good engineering practices, and failing to implement certain required spill prevention measures, in violation of 40 C.F.R. §§ 112.3 and 112.7.  In its SPCC Plan, BPXA specifically:

a.  failed to identify the location of bulk storage containers observed at the facility, including some stationary tanks, oil-filled operational equipment, oil separation and treating vessels and equipment, and long-term storage locations for mobile containers and drums, as required by 40 C.F.R. § 112.7(a)(3);

b. failed to provide sufficient impracticability statements for secondary containment for mobile and portable tanks and tank battery, separating and treating facility installations as required by 40 C.F.R. § 112.7(d); and

c. failed to adequately complete an "Applicability of Substantial Harm Criteria" certification form as required by Appendix C to Part 112.

82. By its failure to prepare and implement an SPCC Plan at the Milne Point Unit facility in accordance with good engineering practices, and its failure to implement certain required spill prevention measures, BPXA violated the regulations at 40 C.F.R. Part 112, issued under CWA Section 311(j), 33 U.S.C. § 1321(j), which sets forth the requirements for preparation and implementation of SPCC Plans.

83. Accordingly, pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), as adjusted by 40 C.F.R. § 19.4, BPXA is liable for injunctive relief and a civil penalty of not to exceed $32,500 per day per violation.

**Sixth Claim for Relief**
(Failure to Prepare and Implement an Adequate SPCC Plan at the Badami Unit Facility)

84. The allegations of the foregoing paragraphs are incorporated herein by reference.

85. At the Badami Unit, BPXA failed to comply with the requirements of the CWA and the SPCC Regulations promulgated thereunder, by failing to prepare and implement an SPCC Plan in accordance with good engineering practices, and failing to implement certain required spill prevention measures, in violation of 40 C.F.R. §§ 112.3 and 112.7. Specifically, BPXA:

a. failed, in its SPCC Plan, to identify the location of bulk storage containers observed at the facility, including some stationary tanks, oil-filled operational equipment, oil separation and treating vessels and equipment, and long-term storage locations for mobile containers and drums, as required by 40 C.F.R. § 112.7(a)(3);

b.  failed, in its SPCC Plan, to indicate the type of oil and storage capacity for all oil storage containers of 55 gallons and above, as required by 40 C.F.R. §112.7(a)(3)(i);

c.  failed, in its SPCC Plan , to provide sufficient impracticability statements for secondary containment for mobile and portable bulk storage containers, as required by 40 C.F.R. § 112.7(d); and

d.  failed, in its SPCC plan, to address appropriate containment for any of the oil separation and treating vessels and equipment with capacities greater than 55-gallons at the Badami Unit as required by § 112.9(c)(2).

86.  By its failure to prepare and implement an SPCC Plan at the Badami Unit facility in accordance with good engineering practices, and its failure to implement certain required spill prevention measures, BPXA violated the regulations at 40 C.F.R. Part 112, issued under CWA Section 311(j), 33 U.S.C. § 1321(j), which sets forth the requirements for preparation and implementation of SPCC Plans.

87.  Accordingly, pursuant to Section 311(b)(7)(C) of the CWA, 33 U.S.C. § 1321(b)(7)(C), as adjusted by 40 C.F.R. § 19.4, BPXA is liable for injunctive relief and a civil penalty of not to exceed $32,500 per day per violation.

### Seventh Claim for Relief
(Failure to comply with the Order issued by DOT)

88.  The allegations of the foregoing paragraphs are incorporated herein by reference.

89.  The Order required BPXA to take necessary corrective action in the Greater Prudhoe Bay Unit to protect the public, property, and the environment, pursuant to 49 U.S.C. § 60112. BPXA violated the Order numerous times, including when:

a.  BP failed to begin weekly cleaning of the 34-inch pipeline segment between Gathering Center 1 to Skid 50 until about November 7, 2006, which was approximately 149 days after the Order's deadline;

b. BP failed to begin weekly cleaning of the 34-inch pipeline between Flow Station 1 and Skid 50 until about October 10, 2006, which was approximately 120 days after the Order's deadline;

c. BP failed to begin the weekly cleaning of the 30-inch pipeline between Flow Station 2 and Flow Station 1 until about July 20, 2006, which was approximately 39 days after the Order's deadline;

d.  BP failed to perform an internal inspection of the 34-inch pipeline between Gathering Center 1 and Skid 50 until about November 12, 2006, which was approximately 151 days after the Order's deadline;

e. BP failed to perform an internal inspection of the 34-inch pipeline between Flow Station 1 and Skid 50 until about October 18, 2006, which was approximately 124 days after the Order's deadline;

f. BP failed to perform an internal inspection of the 30-inch pipeline between Flow Station 2 and Flow Station 1 until about July 22, 2006, which was approximately 37 days after the Order's deadline;

g. BP failed to perform an internal inspection of the Lisburne pipeline until about June 30, 2006, which was approximately 15 days after the Order's deadline.

90.  Unless enjoined, Defendant may violate the Order and 49 U.S.C. § 60112 again.

91.  Pursuant to 49 U.S.C. § 60120, Defendant is liable for civil penalties for each violation of the Order, considering the same factors as prescribed for the Secretary in an

COMPLAINT - Page 20

administrative case under section 60122, and for injunctive relief.

## Eighth Claim for Relief
(Failure to comply with asbestos NESHAP)

92. The allegations of the foregoing paragraphs are incorporated herein by reference.

93. At the Greater Prudhoe Bay Unit, Defendant failed to comply with the requirements of the asbestos NESHAP, 40 C.F.R. §§ 61.140-61.157, and of Section 112 of the CAA, 42 U.S.C. § 7412. Specifically, Defendant failed to comply by:

a. Failing to conduct a survey of the facility or part of the facility where the renovation occurred for the presence of asbestos before beginning the renovation;

b. Failing to provide written notification at least 10 working days prior to beginning asbestos stripping or removal work in March 2006;

c. Failing to adequately wet regulated asbestos-containing materials that were being stripped from facility components;

d. Failing to adequately wet regulated asbestos-containing material that had been stripped from facility components and ensure that it remained wet until collected and contained or treated in preparation for disposal;

e. Failing to have an on-site representative trained in proper removal of regulated asbestos-containing materials present while regulated asbestos-containing material was being stripped, removed or otherwise handled or disturbed;

f. Failing to mark vehicles used to transport asbestos-containing waste material during the loading and unloading of waste;

g. Failing to deposit asbestos-containing waste material at a waste disposal site operated in accordance with 40 C.F.R. § 61.154;

h.  Failing to maintain waste shipment records for all asbestos-containing waste material

transported off the facility site; and

i.  Discharging visible emissions to the outside air during the collection, processing,

packaging, or transporting of asbestos-containing waste material, without using one of

the emission control and waste treatment methods specified in 40 C.F.R. § 61.150(a)(1)

through (4).

94.  Unless enjoined, Defendant may continue to violate the asbestos NESHAP and the

CAA.

95.  Pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b), as amended by the

Debt Collection Improvement Act of 1996, 31 U.S.C. § 3701, and the Civil Monetary Penalty

Inflation Adjustment Rule, 40 C.F.R. Part 19, Defendant is liable for civil penalties up to

$32,500 per day for each violation and for injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, based upon all the allegations set forth above, Plaintiff United States of

America, prays that this Court:

1.  Impose civil penalties on Defendant in an amount of up to $1,100 per barrel of oil

discharged in violation of Section 311(b)(3) of the Clean Water Act, and to the extent

each discharge was the result of gross negligence or willful misconduct by the Defendant,

impose civil penalties of not less than $130,000 for each discharge and up to $4,300 per

barrel of oil discharged;

2.  Order Defendant to take all appropriate action to prevent further spills from its facilities

into waters of the United States, in compliance with the Clean Water Act and the SPCC

Regulations;

3.   Assess civil penalties for each violation of the asbestos NESHAP, the Clean Air Act, the

SPCC Regulations, and the Clean Water Act not to exceed $27,500 per day for each

violation that occurred prior to March 15, 2004 and not to exceed $32,500 per day for

each violation which occurred on or after March 15, 2004;

4.   Assess civil penalties pursuant to 49 U.S.C. § 60120 against Defendant in an amount

appropriate to the nature, circumstances, gravity of the violation, including adverse

impact to the environment; the violator's degree of culpability; good faith in attempting to

comply with regulations; the economic benefit gained from the violations without any

reduction because of subsequent damages; and other matters that justice requires; and

5.   Enjoin Defendant from further violations of the Pipeline Safety Act and its implementing

regulations, the Clean Air Act, and the asbestos NESHAP;

6.   Award the United States its costs of this action; and

7.   Grant such other relief as the Court deems just and proper.

Respectfully submitted,

JOHN C. CRUDEN
Acting Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

KATHERINE A. LOYD
United States Department of Justice
Environment and Natural Resources Division
1961 Stout St., 8th floor
Denver, CO 80294
(303) 844-1365
(303) 844-1350 (fax)
kate.loyd@usdoj.gov
Attorney for United States of America

COMPLAINT - Page 23